2014 VT 130

# Kathleen Langlois v. Town of Proctor

[113 A.3d 44]

No. 13-229

Present: **Reiber, C.J., Dooley, Skoglund, Robinson and Crawford, JJ.**[1]

Opinion Filed December 5, 2014

---

[1] Justice Crawford was present for conference on the briefs, but did not participate in this decision.

138

*John Paul Faignant* of *Miller Faignant & Robbason, P.C.*, Rutland, for Plaintiff-Appellee/Cross-Appellant.

*Philip C. Woodward* of *Woodward & Kelley, PLLC*, South Burlington, for Defendant-Appellant/Cross-Appellee.

¶ 1. **Dooley, J.** This is an unusual dispute that arose from the failure of plaintiff Kathleen Langlois, owner of a building with commercial space on the first floor and an apartment on the second floor, to pay her water bill for the property to defendant Town of Proctor, and from the Town's alleged failure to turn the water off pursuant to the parties' agreement. Plaintiff alleged, in pertinent part, that she arranged with a representative of the Town that it would disconnect the water service so she would not incur further water expenses, but that the Town failed to do so.

She further alleged that in reliance on the Town's promised undertaking she discontinued heating the building, causing the pipes containing water to freeze and split under the first floor of the building, which, in turn, flooded the first floor and basement, causing extensive damage to the building. The jury found the Town negligent and awarded plaintiff damages of $64,918.44. We reverse and remand because of the trial court's failure to instruct on comparative negligence, but affirm in all other respects.

## I. Procedural History

¶ 2. Plaintiff brought this action with four counts: negligence, breach of contract, consumer fraud, and negligent misrepresentation. The main count involved in this appeal alleged that the Town was negligent for failure to turn off the water and that its negligence was the proximate cause of plaintiff's damages. Another count alleged that the parties had a contract with respect to the supply of water and that the Town breached the contract by sending a false notice that it had disconnected the water and by failing to remediate its inaction once it was discovered. In the breach-of-contract count, plaintiff also claimed that the Town had breached its obligation of good faith and fair dealing.

¶ 3. The Town moved for summary judgment. With respect to the negligence count, the Town argued that it had no duty to disconnect the water service or to disconnect the service with reasonable care or, alternatively, that any duty was based on its contractual obligations and could not give rise to tort liability. With respect to the contract claim, the Town argued that it had no contractual obligation to disconnect the water service and that it was exercising its right under a statutory delinquency collection procedure. It further argued that the contractual relationship between plaintiff and the Town was terminated when plaintiff failed to pay her water bill.

¶ 4. The superior court eventually dismissed the consumer fraud and negligent misrepresentation counts, but denied the Town's motion for summary judgment on the tort and contract claims. The court found that there was a material issue of fact with respect to whether the Town employee actually turned off the water at the time he said he did. Moreover the court concluded:

> Plaintiff's claims are rooted in the Town's ordinance governing the relationship between the Town as water

supplier and Plaintiff as ratepayer. The ordinance describes itself as "a contract between each ratepayer and the Town." This contractual relationship contained in the ordinance, coupled with Town's alleged negligence in failing to actually disconnect Plaintiff's water and alleged misrepresentations in informing Plaintiff that her water had in fact been disconnected when it had not, provides a sufficient legal basis for Plaintiff's claims. Defendant is not entitled to judgment as a matter of law.

¶ 5. The case was then tried before a jury, which rendered a verdict for plaintiff. In answering the special interrogatories, the jury found that there was a contract between plaintiff and the Town "regarding the turning off of her water service," but that the Town had not breached that contract. It found that the Town was negligent, that its negligence was a proximate cause of harm to plaintiff, and that plaintiff's damages were $64,918.44.

¶ 6. On appeal, the Town argues that it had no tort duty to properly turn off plaintiff's water service, that the court should have instructed the jury to apply comparative negligence, and that the instructions on damages were erroneous because the proper measure of damages is the diminution in value of the building and, in any event, there was no evidence of that diminution. Plaintiff cross-appeals, arguing that the jury instructions improperly failed to allow the jury to find that the Town breached its duty of good faith and fair dealing.

## II. Duty

¶ 7. ■ We begin with the question of duty. As we held recently in *Buxton v. Springfield Lodge No. 679, Loyal Order of Moose, Inc.*, an action for negligence fails in the absence of a duty of care. 2014 VT 52, ¶ 7, 196 Vt. 486, 99 A.3d 171. Whether a duty was present, as well as the scope of any duty, is primarily a question of law. *Id.* The Town argues that it had no duty to turn off the water, or to turn the service off in a particular way, for nonpayment of water charges. It further argues that the tort duty plaintiff asserted arose out of the contractual relationship between plaintiff and the Town, but that plaintiff's assertion is invalid because a tort duty must arise independent of any contractual obligations.

¶ 8. In response, plaintiff argues that the Town's tort duty arose from its undertaking to disconnect the water service and plaintiff's

reliance upon that undertaking. She bases this argument on the Restatement (Second) of Torts § 323 (1965).

¶ 9. In addressing these arguments, we recognize that theories of duty significantly morphed during the course of this litigation, and those changes in theories affect the way the issue is framed on appeal. The trial judge made no mention of duty in the instructions to the jury, saying in essence that negligent failure to properly disconnect the water service was actionable. Nor did the summary judgment decision contain a clear specification of the court's theory of duty. Rather, it stated simply that "this contractual relationship contained in the ordinance, coupled with misrepresentations in informing Plaintiff that her water had in fact been disconnected when it had not, provides a sufficient legal basis for Plaintiff's claims." We note, however, that the Town did not preserve an objection to the jury instructions, so the issue on appeal is solely whether plaintiff made out a duty to support her claim of negligence, not what the scope or nature of that duty was or whether the trial court properly instructed the jury on duty.

¶ 10. ■ In considering that issue, we start with the Restatement section relied upon by plaintiff on appeal. Section 323 provides:

> Negligent Performance of Undertaking to Render Services
>
> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323. This Court has applied § 323, and its cousin, § 324A, which governs harm to a third person, in a number of cases. See *Sabia v. State*, 164 Vt. 293, 302-04, 669 A.2d 1187, 1194 (1995); *Smyth v. Twin State Improvement Corp.*, 116 Vt. 569, 570-71, 80 A.2d 664, 665 (1951); see also *Derosia v. Liberty Mut. Ins. Co.*, 155 Vt. 178, 182-83, 583 A.2d 881, 883

(1990) (adopting § 324A). Thus, we have recognized and chosen to follow this Restatement section.

¶ 11. Without saying so directly, the Town challenges the application of § 323 by claiming that its underlying obligation is contractual. The Town relies on a sentence from *Springfield Hydroelectric Co. v. Copp*, in which this Court stated that a tort duty of care must be " 'independent of any contractual obliga- tions.' " 172 Vt. 311, 316, 779 A.2d 67, 71-72 (2001) (emphasis omitted) (quoting *Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267, 1269 (Colo. 2000)). The Town argues that there is no recognizable tort duty because plaintiff is basing the Town's duty on the breach of a contract to turn off the water. The short answer to the Town's argument is that although the jury found that the Town had a contractual duty to disconnect the water, it also found that the Town did not breach that contractual duty. Thus, the jury's award was not based on breach of any contractual duty. We do not rely upon the jury determination alone in rejecting the Town's argu- ment, however, because neither the judge nor the jury defined the duty on which the tort liability was based.

¶ 12. We conclude that the Town reads too much into *Spring- field Hydroelectric*. The issue in that case was whether the plaintiff could obtain a tort recovery for purely economic losses in the absence of physical damage. Thus, the sentence on which the Town relies was part of the overall holding that negligence liability, even if based on a contractual duty, could not give rise to recovery for intangible economic loss in the absence of accompa- nying physical harm. *Id.* at 314-15, 779 A.2d at 70-71. We did not hold that the duty on which plaintiff relies for a tort action can never be contractual.

¶ 13. In fact, many of our duty cases are based on undertakings involving contractually assumed duties. For example, in *Perry v. Green Mountain Mall*, the defendant had a contract with a mall owner to maintain the parking lot and roads around the mall. 2004 VT 69, 177 Vt. 109, 857 A.2d 793. The plaintiff was an employee of a mall store who was injured when her car skidded on ice in the parking lot, and she sued defendant for negligent failure to remove the ice. We found that the plaintiff's complaint alleged a duty recognized under § 324A of the Restatement. *Id.* ¶ 10. Neither § 323 nor § 324A suggest that the duty stemming from the undertaking cannot be contractually based. Both apply to an undertaking "for consideration," which is one way to describe a

contract. Indeed, the only case we have directly on this point involved a defendant who argued that a § 323 duty *had* to be contractual. See *Smyth*, 116 Vt. at 570-71, 80 A.2d at 665.

¶ 14. ■ ■ The evidence in this case was sufficient for a factfinder to find that the elements of § 323 were established. Plaintiff testified that the agent of the Town responsible for utility disconnections promised to disconnect the water service to the building. The Town's witnesses established that a Town worker went to the site in May 2009 and believed he had turned off the water at the "curbstop," a valve in the right of way. Thus, there was adequate evidence of an undertaking, whether gratuitous or contractual. See *Sabia*, 164 Vt. at 303, 669 A.2d at 1194 ("[C]ourts generally require very little action on the part of defendants to find an undertaking.").

¶ 15. Further, there was evidence that Town workers were aware of the consequences if water was not disconnected and went into an unheated building. In fact, there was testimony that this had happened to another customer about a year before the events of this case. Thus, there was evidence that Town workers recognized that turning off the water was necessary to protect plaintiff's property. Finally, plaintiff testified that she relied upon the Town employee's promise to have the water disconnected when she discontinued heat to the building, meeting the requirement of § 323(b).

¶ 16. We recognize that there was conflicting testimony on at least one of the main elements of the tort and that neither the court nor the jury made findings resolving the conflict. The person responsible for utility disconnections for the Town testified that she did not promise to disconnect the water service and was not authorized to make such a promise in any event. Nevertheless, as we noted above, the Town has not challenged the findings or the jury instructions. Thus, the factual disagreement is not before us. In short, we reject the Town's argument on appeal that it had no tort duty to properly turn off plaintiff's water.

### III. Comparative Negligence

¶ 17. We turn now to the Town's claim that the trial court's refusal to instruct the jury on comparative negligence constitutes reversible error. The Town submitted proposed jury instructions that included an instruction on comparative negligence. The pro-

posed instruction was generic — it did not describe the negligence the Town alleged. There was, however, a conference on the instructions. In the conference, plaintiff argued that comparative negligence did not apply because plaintiff had nothing to do with the failure to turn off the water — the applicable doctrine was mitigation of damages. The Town argued that both mitigation of damages and comparative negligence were involved because plaintiff should have checked immediately whether the water was off, and if she had, no damage would have occurred. The court declined to include the comparative negligence instruction, stating that "under the circumstances, I'm not sure what duty Ms. Langlois would have had to go and check on the house." The Town objected to the court's decision prior to the actual jury instruction as well as after.

¶ 18. The instructions did include a section on "Mitigation of Damages," which applies to each of plaintiff's recovery theories. It states that "a person who has suffered damages has a duty to take protective or preventative measures in an effort to reduce the harm or prevent its further increase." The instruction noted that the burden of proof for mitigation is on defendant and that if the jury found "plaintiff could reasonably have avoided some of the damages claimed by taking any reasonable action" the jury must reduce the award by the amount that could have been avoided.

¶ 19. ▪ The trial court has a duty to instruct the jury on all issues essential to the case. *Barber v. LaFromboise*, 2006 VT 77, ¶ 14, 180 Vt. 150, 908 A.2d 436. On appeal, the party alleging that the court erred by omitting an essential instruction must establish that the omission was "both clearly erroneous and prejudicial." *Id.* The trial court enjoys discretion over the extent to which it elaborates on each instruction, but the charge as a whole must not mislead the jury as to the spirit of the law. *Malaney v. Hannaford Bros. Co.*, 2004 VT 76, ¶ 21, 177 Vt. 123, 861 A.2d 1069.

¶ 20. The central question is whether, under the evidence, the jury could have found that: (1) plaintiff was also negligent, such that the jury should have found the degree of that negligence and compared it to the degree of defendant's negligence; (2) plaintiff should have taken actions to mitigate her damages; (3) or both. Whatever the context, other courts and academics have struggled to find a consistent answer to the question of when comparative negligence or mitigation of damages applies.

¶ 21. In examining the doctrines, we start with comparative negligence, which is defined and controlled by statute in Vermont. Section 1036 of Title 12, entitled "Comparative negligence," provides as follows:

> Contributory negligence shall not bar recovery in an action by any plaintiff, or his legal representative, to recover damages for negligence resulting in death, personal injury or property damage, if the negligence was not greater than the causal total negligence of the defendant or defendants, but the damage shall be diminished by general verdict in proportion to the amount of negligence attributed to the plaintiff. Where recovery is allowed against more than one defendant, each defendant shall be liable for that proportion of the total dollar amount awarded as damages in the ratio of the amount of his causal negligence to the amount of causal negligence attributed to all defendants against whom recovery is allowed.

As the words reflect, comparative negligence was adopted as a replacement for the common law doctrine of contributory negligence, which denied the plaintiff all recovery if the jury found that the plaintiff was negligent to any extent and that the negligence was a proximate cause of the damage. See *Washburn v. Tracy*, 2 D. Chip 128, 136, 1824 WL 1346, at *1 (Vt. 1824) ("[T]he law is, that where the injury arises from the plaintiff's own misconduct, or want of ordinary caution, notwithstanding the defendant's neglect, . . . the plaintiff cannot recover."). The statute establishes a policy of "modified comparative negligence" that allows a recovery if plaintiff was responsible for fifty percent or less of the total causal negligence. Under the statute, defendant is responsible for that percentage of plaintiff's damages that is equal to the percentage of causal negligence attributable to the defendant. Comparative negligence thus operates to reduce a plaintiff's recovery by comparing the parties' relative negligence in causing plaintiff's injury. *Gilman v. Towmotor Corp.*, 160 Vt. 116, 121, 621 A.2d 1260, 1263 (1992). In the typical case, each party's fault has contributed to the whole harm. "Because the plaintiff has suffered but one harm that cannot be divided into parts, courts in a comparative negligence system apportion liability between the plaintiff and defendant in proportion to their fault in causing the

loss as a whole." 1 D. Dobbs et al., The Law of Torts § 229, at 822 (2d ed. 2011).

¶ 22. ■■■ Mitigation of damages also operates to reduce a plaintiff's recovery, but derives from damages law generally, with a different justification. Under the mitigation of damages doctrine — also known as the doctrine of avoidable consequences — a plaintiff may not recover for any damages that the plaintiff could have avoided or minimized through reasonable care or expenditure. *Id.* at 820. We have recognized damages mitigation as part of Vermont's common tort law for well over a century. In *Lloyd v. Lloyd*, 60 Vt. 288, 290, 13 A. 638, 639 (1888), this Court held that, where plaintiff could have reasonably avoided $100 of damages by spending $25, he was entitled to recover only $25, reasoning:

> It is the duty of a person injured by the fault of another to use all reasonable means to protect himself against injurious consequences. If injured in his person he must attend to his cure. If injured in his estate he must attend to its preservation. If he fails in this duty he cannot gather the fruits of his own negligence.

See also *Brown v. Sutkowski*, 117 Vt. 377, 379, 91 A.2d 556, 557 (1952); Restatement (Second) of Torts § 918. The rule of avoidable consequences is a negligence rule, and the negligence analysis for determining whether consequences could have been avoided is the same as the analysis for determining whether plaintiff was contributorily negligent. Restatement (Second) of Torts § 918 cmt. c.

¶ 23. ■■■ Generally, the avoidable consequences rule is applied when courts can identify and isolate two or more distinct items of harm resulting from two or more distinct acts or causes. When courts deem it just, they can allocate the entire responsibility for one discrete item of harm to the plaintiff as the responsible party causing that particular harm. Dobbs, *supra*, at 822. Damages mitigation thus depends on analyzing the cause of each item of damages and barring the plaintiff completely from recovering those damages for which he or she is deemed responsible. This is sometimes referred to as "causal apportionment," in contrast with the comparative negligence "fault apportionment." *Id.* at 822-23. Depending on which method is used, a plaintiff's damages may come out differently. *Id.*

¶ 24. Jurisdictions differ in how the two rules interact. In some cases, comparative negligence essentially subsumes mitigation, with all reduction in a plaintiff's recovery controlled only by relative fault. E.g., *Ridley v. Safety Kleen Corp.*, 693 So. 2d 934, 943-44 (Fla. 1996) (interpreting Florida statute to require only comparative fault assessment and not mitigation). This is also the direction taken by the Third Restatement of Torts. See Restatement (Third) of Torts: Apportionment of Liab. § 3 cmt. b (2000) ("This Section applies to a plaintiff's unreasonable conduct that aggravates the plaintiff's injuries. No rule about mitigation of damages or avoidable consequences categorically forgives a plaintiff of this type of conduct or categorically excludes recovery."); *id.* § 8 (setting forth factors for assigning responsibility amongst all persons involved in tort, including plaintiff).

¶ 25. Other jurisdictions apply the damages mitigation doctrine only to a plaintiff's post-injury conduct and apply comparative negligence to damages from all other sources. E.g., *Kocher v. Getz*, 824 N.E.2d 671, 674 (Ind. 2005) (applying damages mitigation only to post-injury conduct). This is the historical majority rule, and the rule plaintiff urges us to adopt in this case. See 3 J. Stein, Personal Injury Damages § 18:2 (3d ed. 2014) (stating that determination of which doctrine applies "is generally considered to be dependent on the sequence of events"); Y. Adar, *Comparative Negligence and Mitigation of Damages: Two Sister Doctrines in Search of Reunion*, 31 Quinnipiac L. Rev. 783, 799 (2013) ("It is universally accepted that the 'duty to mitigate' arises only after the completion of a legal wrong against the plaintiff, that is, in the context of a tort action, only once the tort is complete."). Still other jurisdictions apply damages mitigation only to discrete items of harm that are tied to a plaintiff's conduct and apply comparative negligence to damages from all other sources. E.g., *Halvorson v. Voeller*, 336 N.W.2d 118, 121 (N.D. 1983) (adopting minority view that pre-injury conduct, such as not wearing motorcycle helmet, may be used to mitigate damages in amount that injury could have been avoided by such use).

¶ 26. We have never decided this question. See *Grazulis v. Curtis*, 149 Vt. 371, 372, 543 A.2d 1324, 1326 (1988) (stating that question of which doctrine applies not reached because of lack of preservation). In the leading case of *Smith v. Goodyear Tire & Rubber Co.*, 600 F. Supp. 1561 (D. Vt. 1985), Judge Coffrin addressed whether the plaintiff's failure to wear a seatbelt could

be comparative negligence or violate the plaintiff's duty to mitigate damages where the plaintiff is injured in an automobile accident by a negligent driver.[2] The court held that the jury could find the plaintiff negligent for not wearing a seatbelt, such that the plaintiff's negligence would be compared under the statute to that of the defendants for purposes of determining the extent of liability. *Id.* at 1565. The court specifically rejected the plaintiff's argument that because the plaintiff's seatbelt nonuse was related only to the extent of his injuries and not to the accident, it could not be compared under the statute. It held that the courts that had drawn this distinction did so to avoid the harsh doctrine of contributory negligence, and stated that "due to Vermont's comparative negligence doctrine, we need not resort to such judicial sleight-of-hand." *Id.* at 1566. It also held that the jury could consider nonuse of a seatbelt as a breach of plaintiff's duty to mitigate damages even though the act of failing to engage the seatbelt preceded the accident.[3] *Id.* at 1567. *Smith* was a diversity-of-citizenship case and was applying Vermont law, specifically the comparative negligence statute.

¶ 27. Before we look to the facts of this case, we must address the trial court's basis for refusing to instruct on comparative negligence — that plaintiff had no duty to determine whether the water had been turned off. We reject this conclusion. In the context of a comparative fault analysis, plaintiff had a general duty to take due care with respect to her own property. The questions for the jury were, under the circumstances of this case, whether plaintiff failed to take due care and, if so, to what extent her conduct caused the claimed injuries.

¶ 28. In the case before us, we conclude that comparative negligence applies, at least in part, regardless of the theory we

---

[2] *Smith* also addressed whether comparative negligence applied in strict liability cases; that part of the decision is not relevant here. We also note that under current statutory law, noncompliance with provisions requiring use of seatbelts is not admissible as evidence in any civil proceeding. 23 V.S.A. § 1259(c).

[3] Although we held in *Grazulis* that defendants had not preserved their argument, we discussed *Smith*. We described it as holding that the comparative negligence statute applied even though plaintiff's negligence "went only to the extent of his injury and not to the cause of the accident." *Grazulis*, 149 Vt. at 373, 543 A.2d at 1325. It described the mitigation of damages discussion as holding that "the use of the comparative negligence statute in such a case is the same as allowing the jury to consider plaintiff's negligence in apportioning damages." *Id.* at 374, 543 A.2d at 1326.

follow. The relevant sequence of events was as follows. Plaintiff testified that pipes had frozen and split in the apartment previously and as recently as the winter of 2008-2009. No significant damage occurred as a result of this break because it was identified quickly. Plaintiff testified that she had her plumber friend drain the pipes in the building shortly thereafter — although accounts differ as to when this actually happened because the plumber friend later testified that he drained the pipes in the fall of 2009.[4] The plumber turned off the water at a turnoff valve on the first floor of the building.

¶ 29. No one from the Town attempted to enter the building[5] and check whether the water was off after the May 2009 attempt to turn it off at the check valve. The witness for the Town testified that such a check was not done in case of an involuntary disconnection to avoid a confrontation with the owner.

¶ 30. The damage was caused by a frozen and split pipe in an unfinished basement under the first floor. The pipe from the main line came .in through the foundation and up to the first floor where the turnoff valve had been installed. The split occurred in that line before it reached the first-floor turnoff valve. A witness called by the Town testified that all buildings have a cellar valve where one can and should turn off water coming into the house because the pipe from the Town line is below the frost depth until it enters the house. The plumber did not attempt to turn off the water at a cellar valve, leaving water between that point and the first-floor valve.[6]

¶ 31. As noted, Town employees came to plaintiff's house to shut the water off at the curb stop in May 2009. Plaintiff did not heat

---

[4] Either way, plaintiff had the pipes in the building drained before the damage occurred in the winter of 2009-2010. If the jury believed the plumber's testimony, which was more precise, his actions occurred after plaintiff believed the water had been turned off. The plumber could have easily checked on whether the water was, in fact, off.

[5] There was no way to determine whether the water was off without entering the building. The evidence does not show whether the building was locked. In any event, no Town worker requested permission to enter the building.

[6] The only person who testified as to who had entered the cellar was plaintiff's damage expert. Although a photograph he took arguably showed the cellar valve, he could not identify it as such. Thus, there was no evidence that there was a cellar valve in this case. The plumber testified that curb stops have weeping holes that open when the valve is closed. The hole allows water in the line to the building and from the building to run out.

the building at all during the winter of 2009-2010, when the pipe presumably burst. Plaintiff used part of the building periodically in 2010 to temporarily store trash, but did not enter the part of the first floor where the leak occurred until August 10, 2010, when the leak was discovered. At trial, the only damage assessment was provided by plaintiff's expert witness, who estimated the cost of repair to the building would be $97,523.75 and testified that the damage to personal property in the building amounted to around $5,521.40.

¶ 32. ▮▮▮ The traditional temporal line to determine whether comparative negligence or mitigation/avoidable consequences applies is when the plaintiff becomes aware of being harmed by the defendant's negligence. See Adar, *supra*, at 819 (stating that historical temporal borderline between comparative negligence and failure to mitigate "is the moment in which the [plaintiff] becomes aware of . . . becoming a victim of a tort"); 3 J. Stein, Personal Injury Damages § 18:2 (stating that avoidable consequences applies "after the plaintiff has been injured by the defendant under circumstances in which the defendant is liable for the original injury [and] some of the injuries could have been avoided by the plaintiff's exercise of reasonable precautions"). We recognize that the Town is contending that plaintiff was negligent in not becoming aware of the water damage earlier. Arguably, plaintiff should have checked the part of the first floor where the water was running both before and after the temperature fell to the point where the pipe split, but it is difficult to determine what damage would have been avoided even if one chose an arbitrary date by which the leak should have been discovered. This is a question of fact for the jury on remand.

¶ 33. ▮▮▮ The modern approach to comparative negligence and avoidable consequences is based on the recognition that these doctrines address identical policy judgments but reach different results. See Adar, *supra*, at 839-40. As the Reporters' Note to the Third Restatement of Torts explains:

> Before comparative responsibility, a plaintiff's negligent *post-accident* failure to mitigate damages barred recovery for that portion of the damages. The jury was instructed not to include such damages in the verdict. . . . This approach made sense when a plaintiff's negligence was an absolute bar to recovery; it barred the plaintiff from

recovering any damages caused by plaintiff's negligent failure to mitigate. By instructing the jury to consider a plaintiff's negligent failure to mitigate damages in the damages question, courts avoided confusing the jury into thinking that the plaintiff's conduct should also bar the plaintiff from recovering for the original injuries. Under comparative responsibility, it no longer makes sense to have a plaintiff's negligence constitute an absolute bar to recovery, even for the portion of the plaintiff's injuries caused by that conduct. The underlying premise of comparative responsibility is that a plaintiff's negligence should reduce, not bar, the plaintiff's recovery for any damages caused both by that conduct and by the defendant's conduct. A plaintiff's failure to mitigate damages should no longer constitute a bar to recovering those damages. Under comparative responsibility, a plaintiff's negligent failure to mitigate damages is a factor to consider when assigning percentages of responsibility. It does not totally exclude recovery of the damages caused by plaintiff's failure to mitigate.

Restatement (Third) of Torts: Apportionment of Liab. § 3, Reporters' Note, cmt. b.

¶ 34. Several considerations favor adopting this view. First, while we are not constrained to follow the Restatements, we have generally done so unless there is a strong rationale to the contrary. See *Provoncha v. Vt. Motocross Ass'n*, 2009 VT 29, ¶ 12, 185 Vt. 473, 974 A.2d 1261 (following Restatement (Third) of Torts: Apportionment of Liab. § 2 cmts. d, e); *Windsor Sch. Dist. v. State*, 2008 VT 27, ¶ 18, 183 Vt. 452, 956 A.2d 528 (following Restatement (Third) of Torts: Apportionment of Liab. § 22(a)(2)(ii)). We see no such strong rationale here, but the parties have not briefed the issue. Second, the Restatement policy to abandon mitigation of damages in negligence cases is consistent with our comparative negligence statute, which draws no temporal distinction. 12 V.S.A. § 1036 (stating that "the damage shall be diminished by general verdict in proportion to the amount of negligence attributed to the plaintiff"). Finally, applying comparative negligence irrespective of when a plaintiff's negligence occurs in relation to the completion of a defendant's tort would be less confusing for the jury and appears to be the best policy in that

the timing of plaintiff's negligence would not necessarily be determinative of the ability to recover any item of damage.

¶ 35. ▮ On the other hand, the parties have not briefed this issue and there is limited case law addressing the Restatement's view on this point. See Adar, *supra*, at 784-85 (noting that Third Restatement's "revolutionary proposition . . . has barely been mentioned by American courts and has not yet been discussed in the academic literature").[7] Accordingly, we make no determination here whether the Third Restatement position should be adopted in all cases, even those cases involving multiple discrete harms, with one or more of the harms attributable solely to the plaintiff's actions. See Dobbs, *supra*, §§ 229-230, at 822-24 (noting that avoidable consequences rule most often applies when plaintiff is entirely responsible for one of multiple discrete harms, and that some courts apportion responsibility entirely under comparative fault rules when plaintiff and defendant are both responsible for plaintiff's injury). In this case, however, there is no allegation of plaintiff's negligence after she discovered the injury, and no discrete damages allegedly attributable solely to plaintiff. Thus, we agree with the Town that the court should have instructed the jury on comparative negligence rather than on damages mitigation to respond to its claim of plaintiff's negligence.

¶ 36. In short, the instructions as a whole did not contain the spirit of the law. If we could determine from the damages award or the interrogatories[8] that the jury found that plaintiff was not negligent and was not obligated to mitigate damages, we could find an absence of prejudice. We cannot do so here — the damages awarded by the jury were less than plaintiff claimed. We therefore reverse and remand. On remand, the trial court must instruct the jury on comparative negligence.

---

[7] We further note that the Third Restatement adopts a pure comparative responsibility system — at least with respect to indivisible injuries — that bars recovery for a plaintiff only when the plaintiff's percentage of responsibility reaches one hundred percent, Restatement (Third) of Torts: Apportionment of Liab. § 7 cmt. a; whereas Vermont has a modified comparative responsibility system that bars a plaintiff's recovery when the plaintiff's percentage of responsibility exceeds that of the total causal negligence of the defendants — in other words, greater than fifty percent. 12 V.S.A. § 1036. This creates further uncertainty regarding the viability of adopting the Restatement's approach in all situations.

[8] Although defendant requested an interrogatory on mitigation of damages, the trial court rejected that request.

## IV. Damages

¶ 37. ■ Because we reverse and remand on the issue above, it is not required that we address the next issue. We do so, however, because it is likely to arise again in a second trial. The Town argues that the trial court erred in its instruction to the jury on damages, which we review under the same standard articulated above. *Supra*, ¶ 22.[9] Again, we look to the jury instruction as a whole, rather than any particular sentence, to see whether it "breathes the true spirit and doctrine of the law." *Callan v. Hackett*, 170 Vt. 609, 609, 749 A.2d 626, 628 (2000) (mem.) (quotation omitted). If the instruction does not mislead the jury as to the law, we will uphold it. *Id.*

¶ 38. The court issued its instructions on damages as follows:

> As a jury, it is your obligation to arrive at an amount which is supported by the evidence and fair to both the parties. The amount of damages, if any, is a determination for the jury. The plaintiff bears the burden of proving her damages by a preponderance of the evidence. In this action, . . . the plaintiff is seeking to recover for damages to her property due to flooding. For the breach of contract claim, plaintiff seeks as damages the amount that would place her in a position she would have been in had the defendant not breached the contract. . . . For property that has been damaged but can be repaired, the measure of damages is generally the cost [of] repairing the property. For property that has been destroyed and cannot be repaired, the difference in the value of the property before and after it was destroyed is the measure of damages. As to the negligence claim, the measure of damages is, again, either the cost of repairing the property damaged by the defendant's negligence or the decrease in value of the property damaged by the defendant's negligence.

---

[9] Appellant cites only a standard of review for an appeal from a federal bench trial on a breach of contract claim, stating that "[w]hether the district court correctly calculated damages is . . . a question of law that we review *de novo*." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 40 (2d Cir. 2009) (quotation omitted). Although it is true that we review a trial court's statement of the law de novo, there is an additional relevant consideration here as to whether the spirit of the law is appropriately manifested in the jury instruction.

¶ 39. The Town argues that the instruction above is erroneous because it does not include a statement that diminished-value damages should be used when cost-of-repair damages are disproportionate to the value of the property. It concedes that this principle, known as the "doctrine of economic waste," has never been applied in Vermont "in this precise factual context." As the Town has cited only breach-of-contract cases in support of this point, we assume it is referring to the context of tort damages to real property.

¶ 40. The Town argues further, as it must, that plaintiff's proof of her cost-of-repair damages was not complete without evidence that those damages were not disproportionate to the value of the property. It reasons that without such evidence the jury would be unable to calculate damages with reasonable certainty.

¶ 41. ▮ In the context of a tort action for damage to real property, we have stated the rule for damages as follows:

> If the injury is temporary in the sense that restoration can cure the harm, the reasonable cost of repair may serve the need and provide adequate and fair compensation. If the damage is permanent and beyond full repair, the variance in value of the property before and after the injury often affords the better guide to a just award. It all depends upon the character of the property and the nature and extent of the injury.

*Bean v. Sears, Roebuck & Co.*, 129 Vt. 278, 282, 276 A.2d 613, 616 (1971). This is essentially the instruction that the trial court gave. The Town's objection is that the court did not go on to explain that cost-of-repair damages are inappropriate if they are out of proportion to the value of the property.

¶ 42. Most jurisdictions follow some version of our rule from *Bean* quoted above. See Dobbs, *supra*, § 481, at 20. Jurisdictions differ, however, on how they determine whether an injury is "temporary" or "permanent" and therefore when and how to award cost-of-repair damages as opposed to diminished-value damages. *Id.* § 481, at 20-22. Some courts have adopted the rule that the Town promotes — that, even if the injury is temporary, if the cost of repair is greater than the value of the property prior to injury, damages should be limited to the value of the property or the diminution in value. *Alesko v. Union Pac. R.R.*, 109 P.2d

874, 877 (Idaho 1941). Other courts state simply that the permanence of an injury is a question for the jury and, further, that the jury may consider evidence of both types of damages together in their deliberations on the appropriate amount. E.g., *Rempfer v. Deerfield Packing Corp.*, 72 A.2d 204, 209-10 (N.J. 1950) (citing cases).

¶ 43. ▮▮ We acknowledge that our explanation in *Bean* that "[i]t all depends upon the character of the property and the nature and extent of the injury" is not especially descriptive, but in that opinion we also refer to "reasonable cost of repair" and a "just award." 129 Vt. at 282, 276 A.2d at 616. We have held in the contracts context that costs of repair are an appropriate measure of damages unless they are "so inordinate and excessive as to be unreasonable and wasteful." *Sheldon v. Ne. Developers, Inc.*, 127 Vt. 15, 18, 238 A.2d 775, 777 (1968). Our touchstone for determining damages, in tort as in contract, is reasonableness. *Bean*, 129 Vt. at 282, 276 A.2d at 616. We now clarify that the proportionality of cost-of-repair damages relative to the value of the property prior to a tort injury to property is part of the general inquiry on the reasonableness of damages.

¶ 44. ▮ Our recognition of this rule, however, helps the Town only if plaintiff had the burden to show that the repair damages were disproportionate to value. This is true because the Town offered no evidence that the repair costs were disproportionate, and in the absence of evidence on this point, the trial court had no reason to instruct the jury on the point. The Town urges us to require this disproportionality inquiry as part of plaintiff's prima facie case, citing our case law requiring sufficient proof of damages generally, such that the jury may determine damages "with reasonable certainty." *Ferrisburgh Realty Investors v. Schumacher*, 2010 VT 6, ¶ 22, 187 Vt. 309, 992 A.2d 1042 (quotation omitted). We hold instead that the burden of introducing additional evidence with respect to the proportionality of cost-of-repair evidence more appropriately falls on the party who wishes to challenge the cost-of-repair evidence, in this case the Town. See *Martin v. Design Constr. Servs., Inc.*, 2009 -Ohio- 1, ¶¶ 24-25, 902 N.E.2d 10 (establishing that evidence of diminution of market value of property bears on reasonableness of cost-of-repair damages and may be introduced by either party).

¶ 45. ▮ Our standard rule for tort damages is that "plaintiffs must prove, by a preponderance of the evidence, the extent and nature of their damages. Plaintiffs must further show that such damages are the direct, necessary, and probable result of defendant's negligent act." *Callan v. Hackett*, 170 Vt. at 609, 749 A.2d at 628 (citation omitted). We see no reason to alter this rule for plaintiff's prima facie case.

¶ 46. In the case at hand, plaintiff introduced expert evidence as to the nature and extent of her cost-of-repair damages in the amount of $97,523.75. Plaintiff testified that she bought the damaged building, her house, and the land on which both buildings stood for a total of $130,000 in 2005. Plaintiff also testified that she made significant improvements to the building between 2005 and 2008, including a new oil tank, furnace, panel box, breakers, meter pan, entry door, entry subfloor, kitchen floor, kitchen sink, toilet, bathroom sink, bathroom pipes, and bedroom carpeting. She also stated that she refinished hardwood floors in another three rooms. Plaintiff introduced no evidence of the total cost of these improvements; the resultant change in the value of the building due to these improvements; the relative value of the damaged building as compared to the house and the land; the current value of any of the property she purchased in 2005; or the value of the building immediately prior to the burst pipe in this case. The Town introduced no evidence regarding damages at all, but claimed instead during closing arguments — as it claims on appeal — that plaintiff had not met her burden of proof because she did not provide evidence as to the value of the building before or after the damage occurred.

¶ 47. ▮ The Town is mistaken as to the burden of production. Plaintiff met her prima facie case simply by showing evidence of her cost-of-repair damages, chiefly through the testimony of her expert witness. Plaintiff's expert's opinion on the matter was uncontradicted and supported by the record. Although plaintiffs always bear the burden of proof as to the reasonableness of damages, once plaintiff made a prima facie case, the burden of production was then on the Town to present evidence that cost-of-repair damages in this case were unreasonable, for instance in comparison with the value of the building in 2008, or in comparison with the diminution in value of the building before and after the damage occurred.

▮▮▮▮▮▮▮

¶ 48. ▮▮▮ In light of the foregoing analysis of our law on damages, we find that the jury instruction on finding damages in this case was not an abuse of the trial court's discretion, in that it sufficiently reflected the spirit of the law in light of the evidence presented. *Barber*, 2006 VT 77, ¶ 14. Although the instruction might have been clearer had it used the word "reasonable" in reference to the amount of damages to be awarded, the term was implied in the choice the court gave the jury between two methods of damages valuation and also in the instruction that: "As a jury, it is your obligation to arrive at an amount which is supported by the evidence and fair to both the parties. The amount of damages, if any, is a determination for the jury." Given that no evidence was introduced by either party as to the value of the building prior to the damage, or as to the diminution in value of the building before and after the damage, no instruction was necessary on those points.

### V. Implied Covenant of Good Faith and Fair Dealing

¶ 49. The final issue is raised by cross-appeal.[10] Plaintiff challenges the failure of the trial judge to instruct the jury, separately and in detail, on plaintiff's claim that the Town violated the implied covenant of good faith and fair dealing. To evaluate this claim, we must examine plaintiff's underlying theory that the Town breached a contract between plaintiff and the Town with respect to the supply of water, a theory that the Town opposed and the jury rejected on the instructions provided it.

¶ 50. In her complaint, plaintiff alleged that the parties had a contractual relationship with respect to the supply of water and the Town breached the contract "in sending a false notice that the water had been shut off" and in "failing to remediate the action immediately after it was discovered." Plaintiff alleged that this conduct not only breached the contract but also breached the Town's "obligation of good faith and fair dealing."

¶ 51. From the beginning the Town responded that any contract between it and plaintiff terminated because of plaintiff's breach by failing to pay her water bill. It argued that its actions were part of a delinquency procedure that was not contractual but rather were regulated by statute and not contract. In response to the

---

[10] Although our consideration of this issue is also optional, we address it because of the possibility that the issue will be raised again in a retrial.

Town's motion for summary judgment, plaintiff developed the theory that the ordinance provisions created a contract that the Town breached. Without explicitly accepting this theory, the court denied the motion for summary judgment and allowed the jury to consider plaintiff's count that the Town breached a contract and specifically breached the covenant of good faith and fair dealing.

¶ 52. Plaintiff's theory became more explicit in her proposed jury instructions. These proposed instructions described plaintiff's contract theory as: "Plaintiff alleges that the Ordinance and policies adopted by the Town pursuant to the same require that the Defendant properly perform water disconnections, that the Town provide contemporaneous notice of disconnection, and that the Town confirm that said water disconnections were done properly." She requested an explicit instruction on the covenant of good faith and fair dealing, with a quote describing the covenant primarily from our decision in *Harsch Props., Inc. v. Nicholas*, 2007 VT 70, ¶¶ 14-18, 182 Vt. 196, 932 A.2d 1045. The proposed instruction then described the jury's responsibility as to determining whether the Town represented that the water was shut off, when it was not, and whether the failure to shut off the water "was unfair and unreasonable and not made in good faith towards Plaintiff." It concluded that the jury had to find a violation of the covenant if the Town's actions were unfair and unreasonable and not in good faith and "Plaintiff relied on those actions."

¶ 53. The court rejected the proposed instruction and charged as follows:

> Plaintiff asserts two potential sources for a contract between herself and the [defendant]. First, she contends that the Town of Proctor's 2006 water rules constitute a written contract. Second, she contends that the oral contract was formed when the defendant undertook to turn off the water service to her property, and she relied on defendant's promises to turn off the water service to her own detriment.
>
> . . . .
>
> If you find by a preponderance of the evidence that a contract between the plaintiff and the defendant existed under either of these theories, then you should go to consider whether the defendant breached the contract. If

you find that the plaintiff and the defendant had a contract where the defendant promised to turn off the water service to plaintiff's property, you must then decide whether the defendant failed to perform its obligation under the contract.

Plaintiff claims that defendant breached the contract by failing to turn off the water service and by acting in bad faith. All the contracts contain an implied duty that requires the parties to perform their obligations in good faith. You may conclude that the defendant acted in bad faith in carrying out its obligations under the contract. If you find that it is more likely than not true that there was a contract and the defendant breached the contract, then you should go on to consider damages. Otherwise, your verdict on this claim should be for the defendant.

The court submitted special interrogatories to the jury, specifically: "has the plaintiff proven that there was a contract between herself and defendant regarding the turning off of her water service?" — to which the jury answered "Yes" — and "has the plaintiff proven that defendant breached the contract?" — to which the jury answered "No." The jury's negative answer to the second question ended their consideration of the plaintiff's breach-of-contract theory. Plaintiff did not object to the failure of the court to use her proposed instructions on good faith and fair dealing.

¶ 54. Plaintiff argues here that the charge as given "failed to encompass the breadth of the covenant, eliminating from the jury's consideration the catalog of conduct sufficient to warrant a finding of bad faith." Plaintiff itemized the Town's conduct that she believed violated the covenant: (1) denying any intent to enter into an agreement to disconnect the water service and characterizing what occurred as a delinquency procedure rather than a voluntary termination; (2) denying that plaintiff could rely upon representations from defendant's employee; (3) denying the true purpose of an employee's search for a written work order; and (4) falsifying the state of plaintiff's property and the standpipe above the shut-off valve at the time the water leak was discovered.

¶ 55. In evaluating these claims, we will assume that the court correctly decided to submit plaintiff's breach-of-contract claims to the jury. Although the Town argued below, and argues here, that

there was no contract with respect to the disconnection of water service, we need not reach that argument because the jury found there was no breach and, except for the language concerning the covenant of good faith and fair dealing, plaintiff has not challenged the jury instructions. Thus, on remand, nothing is left of plaintiff's breach-of-contract claims, unless we reverse with respect to the jury instructions on the covenant.

¶ 56. Before we discuss the merits of plaintiff's arguments, we note that the detailed violations of the covenant that plaintiff alleges in her brief are significantly different from the violations alleged in her proposed jury instructions. The difference is particularly significant because the appeal issue is whether the trial court erred in refusing to use plaintiff's proposed jury instruction on good faith and fair dealing. While we do not decide on this basis because it is significantly narrower than the rationale below, we note that the grounds now asserted were not preserved in the superior court.

¶ 57. Our main decision on the covenant of good faith and fair dealing is *Carmichael v. Adirondack Bottled Gas Corp.*, 161 Vt. 200, 635 A.2d 1211 (1993). In that case, the plaintiff and her husband purchased a petroleum gas distributorship and signed a supply agreement with the defendant, which according to a term of the contract, would automatically terminate on the death of the plaintiff's husband or other events. The husband died, and the plaintiff took over the business. Rather than terminating the agreement, the defendant made an offer to buy the distributorship to turn it into a retail outlet for the defendant, but the plaintiff rejected the offer. In response to the rejection, the defendant discontinued supplying the business with petroleum, invoking the "key man" provision that became applicable on the husband's death. Litigation resulted. The plaintiff alleged that the defendant's action, using the "key man" provision as a way to induce a sale to it at a favorable price, was a violation of the covenant of good faith and fair dealing.

¶ 58. We looked to the Restatement (Second) of Contracts § 205 (1981) to define the scope of the covenant, its coverage and application. *Id.* at 208, 635 A.2d at 1216. The covenant implements the "underlying principle implied in every contract . . . that each party promises not to do anything to undermine or destroy the other's rights to receive the benefit of the agreement." *Id.* It

exists to ensure that parties to a contract act with " 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' " *Id.* (quoting Restatement (Second) of Contracts § 205 cmt. a). We noted the difficulty in defining a breach of the covenant other than stating the general principles that an action for breach is no different than a tort action and that the concept varies with the context. *Id.* We added that the conduct involved violates community standards of decency, fairness, or reasonableness. *Id.* (quoting Restatement (Second) of Contracts § 205 cmt. a). We quoted from the Restatement comments the type of conduct that violates the covenant. *Id.* at 208-09, 635 A.2d at 1216-17.

¶ 59. We held in *Carmichael* that the facts presented a jury question whether defendant had violated the covenant by using the key man provision to force a sale at an unreasonably low price. This case is far different from *Carmichael.* Here, the jury instructions defined the underlying contract as one to turn off the water, based on either the Town ordinance or the promise of Town staff to do so. The jury found such a contract, enabling plaintiff to argue that the implied covenant had been breached. Nevertheless, as in *Carmichael,* plaintiff had to identify conduct separate from that which breached the underlying contract to form the basis for the breach of the implied covenant. In essence, plaintiff has argued that the conduct that breached the covenant was the Town's refusal to admit its liability for plaintiff's damages.

¶ 60. All of the events that plaintiff itemized in her brief to this Court involve testimony of employees of the Town at trial, rather than the actions they took. A good example is the first of the actions plaintiff claimed violated the covenant: "[T]he Town did not act in good faith when at trial it denied any intent to enter into any agreement to disconnect the water service, stating that it was a delinquency procedure versus voluntary termination, and that [plaintiff's] request on May 12, 2009, was somehow deficient to qualify as a valid request for termination." The testimony was of an administrative employee of the Town who was responsible for administering water bills and their collection. She testified that she never promised to have plaintiff's water service disconnected and that she could not make such a promise because she did not have the power to fulfill it. She further testified that a voluntary termination, which is what plaintiff requested, is permitted only with respect to a person who has paid all outstanding water bills, which plaintiff had not.

¶ 61. ▮ We recognize that the covenant covers not only contract performance, but also contract enforcement. Restatement (Second) of Contracts § 205. A comment to this Restatement provision indicates that enforcement includes "settlement and litigation of contract claims and defenses," *id.* cmt. e, and that the "obligation is violated by dishonest conduct such as conjuring up a pretended dispute, asserting an interpretation contrary to one's own understanding, or falsification of facts." *Id.* We also recognize that the jury must have disbelieved the testimony of the employee to some extent in finding a contract, and yet believed the testimony to some extent in finding no breach of the contract. But disbelieving testimony based on recollection of past events is not a finding that there was "falsification of facts." We do not believe there was sufficient evidence of actual falsification to get to the jury on that claim.

¶ 62. ▮ Further, plaintiff's theory is based on her disagreements with the Town's interpretation of its obligation under its ordinance and, therefore, under the theory that plaintiff put forward that the ordinance provisions were the substance of the contract between the parties. Throughout the litigation, plaintiff struggled with trying to fit her theory within the regulatory language that prevented termination of service without adequate grounds, notice, and process, rather than a direction to terminate service whatever the circumstances. The Town adopted the view that no provision required it ever to terminate service and, therefore, that it never breached any contract based on the statute and ordinance. Whether or not plaintiff's contract theory was viable, the jury could evaluate the competing claims, and there is no evidence that the Town's position was so unreasonable as to constitute bad faith. As the Tennessee Court of Appeals observed:

> The Court is unwilling to find that a party may be held liable for a breach of contract for holding out a good faith but mistaken interpretation of a contract provision. A contrary holding would open a veritable Pandora's Box of litigation, rendering every losing party in a contract dispute potentially liable for a breach of contract based solely on the fact that the Court did not hold with that party's interpretation of a contract provision. The Court finds that this is a box best left closed.

*Dick Broad. Co. v. Oak Ridge FM, Inc.*, 2011 WL 4954199, at *7 (Tenn. Ct. App. Apr. 11, 2012) (quoting trial court opinion); see also *SCO Grp., Inc. v. Novell, Inc.*, 2007 WL 2327587, at *37 (D. Utah Aug. 10, 2007) (no breach of implied covenant where defendant maintained contract interpretation position in litigation that was not objectively unreasonable and where there was no evidence that it was contrary to defendant's own understanding of meaning), *reversed in part on other grounds by SCO Grp., Inc. v. Novell, Inc.*, 578 F.3d 1201 (10th Cir. 2009); *Dotcom Assocs. I, LLC v. United States*, 112 Fed. Cl. 594, 600 (2013) (every breach-of-contract suit involves claim that defendant owes plaintiff money; even if correct, that alone cannot be grounds for breach of implied covenant); *Bayou Land Co. v. Talley*, 924 P.2d 136, 154-55 (Colo. 1996) (covenant does not extend to bringing suit to settle dispute over meaning of contract).

¶ 63. ■■■■ All of plaintiff's grounds have deficiencies similar to those itemized above for the first ground. We recognize that plaintiff's position is that the Town put up a trumped-up defense simply to avoid admitting that it erroneously failed to terminate plaintiff's water service and paying her for the damages she suffered. We cannot conclude, after full review of the evidence, that the jury could have found the Town's defense to have been presented in bad faith, and we hold that plaintiff was not entitled to any instruction on her theory of breach of the implied covenant of good faith and fair dealing. Because the evidence did not support this theory we do not need to decide whether the jury instructions on the theory were adequate. Because plaintiff's claim regarding the implied covenant is the only remaining breach-of-contract claim, the remand ordered in the mandate below involves only the Town's claim that plaintiff was negligent and not that the Town breached a contract.

*Reversed and remanded for a new trial.*